FILED
2025 May-20 PM 12:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

LIONEL MATIZIE SMELLEY,          )
                                 )
        Plaintiff,               )
                                 )
        v.                       )    Case No. 2:23-cv-01419-ACA-NAD
                                 )
PHYLLIS MORGAN, Warden, et al.,  )
                                 )
        Defendants.              )

## REPORT AND RECOMMENDATION

On February 7, 2024, Plaintiff Lionel Matizie Smelley filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights at W.E. Donaldson Correctional Facility, in Bessemer, Alabama. Doc. 13. On October 22, 2024, Plaintiff Smelley[1] supplemented his amended complaint. Doc. 49. Smelley names the following Defendants, each in his or her individual and official capacities: Warden Phyllis Morgan, Lieutenant Akeem Edmonds, Officer Duane Head, and CERT Assistant Team Leader Christopher McWilliams.[2] Doc. 13 at 2–3; Doc. 49 at 2. Smelley seeks compensatory and punitive damages, as well as injunctive relief. Doc. 13 at 8; Doc. 49 at 9; *see* Doc. 62 at 42.

---

[1] Defendants sometimes misspell Plaintiff's name as "Smelly," which this report has cleaned up where appropriate.

[2] "CERT" is an abbreviation for the Alabama Department of Corrections Emergency Response Team.

1

Consistent with the usual practices of this court, this matter was referred for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b); *McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1; N.D. Ala. General Order (Jan. 2, 2015). For the reasons stated below, the court should grant Defendants' motions for summary judgment (Doc. 25; Doc. 52; Doc. 57) on all of Smelley's claims, except for his excessive force claims against McWilliams and Edmonds in their individual capacities only.

## BACKGROUND

### A.    Procedural background

On February 7, 2024, Smelley filed an amended complaint. Doc. 13; *see* Doc. 1 (initial complaint). On February 14, 2024, an order for special report was entered, liberally construing the allegations in Smelley's amended complaint as stating claims against Defendants. Doc. 14. In addition, Smelley was required to notify the court if the court had misunderstood or misconstrued any of the facts that he had alleged or any of his alleged claims. Doc. 14 at 3.

In response to the order for special report (Doc. 14), Morgan, Edmonds, and Head filed a special report, supported by affidavits and other evidence (Doc. 25).

Smelley then sought and received discovery for the names of the CERT members who he alleged assaulted him. Doc. 29; Doc. 30; Doc. 37; Doc. 38. Based on Defendants' response (Doc. 39), Smelley amended his complaint to add

McWilliams as a Defendant.  Doc. 49.

On October 28, 2024, an order for supplemental special reports was entered. Doc. 51.  On November 5, 2024, Morgan, Edmonds, and Head filed a supplemental special report (Doc. 52), and on December 23, 2024, McWilliams filed a special report, supported by an affidavit (Doc. 57).

On January 3, 2025, the parties were notified that the court would construe the special reports as motions for summary judgment, and Smelley was ordered to respond to the summary judgment motions by filing affidavits or other materials, within 21 days.  Doc. 58.  Smelley also was advised of the consequences of any failure to respond or to comply with Federal Rule of Civil Procedure 56.  Doc. 58; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

After filing a motion for an extension of time (Doc. 59), which was granted (Doc. 61), Smelley filed his response on February 10, 2025.  Doc. 62.

### B.    Factual background

#### 1.    Undisputed facts

The following facts are undisputed for purposes of these summary judgment motions:  On August 13, 2023, "an inmate [at Donaldson] was found to have a live handgun inside of the facility and several hostages were detained."  Doc. 25-1 at 1; Doc. 62 at 8.  CERT was deployed to escort all security staff from the prison and to lock down all prison housing units.  Doc. 25-2.

Smelley was housed in C Block at Donaldson.  Doc. 13-1 at 2, 4.  In the C/D corridor, at approximately 10:15 a.m., inmates refused to clear the corridor because breakfast had been canceled, and they wanted to be first in line for the next meal. Doc. 25-3.  Head was trying to get the inmates to return to their cells, and Smelley was attempting to assist him.  Doc. 25-3.

CERT members entered C/D Blocks and yelled for the inmates to clear the corridor.  Doc. 25-3.  Smelley raised his hands but did not return to his cell.  Doc. 25-3.

### 2.    Smelley's sworn allegations and other evidence

Smelley alleges that CERT entered C/D Blocks "hours after" the inmate with the handgun "had . . . been taken safely into custody."  Doc. 62 at 38.

Smelley also alleges that he complied with McWilliams' order to place his hands on the wall.  Doc. 13 at 5; Doc. 49 at 9; Doc. 62 at 40, 47.  Smelley was frisked, and no contraband was found.  Doc. 13 at 5; Doc. 62 at 47.

Inmate James Broughton avers under oath that, shortly before Smelley was attacked by CERT, other inmates were plotting to take Head's keys and "possibly hurt Officer Head."  Doc. 62 at 43.  Smelley discouraged the inmates from taking Head's keys or otherwise trying to hurt Head.  Doc. 62 at 43.  When CERT arrived, Smelley immediately complied with a CERT member's instructions to place his hands on the wall, but that CERT member "pushe[d] Smelley to the floor, and

4

start[ed] beating on Smelley.  About four other [CERT] members joined in on this [beating]."  Doc. 62 at 43.

Inmate Carlos McGlathery avers that a lot of inmates were in the C/D corridor when CERT "came in the corridor, and jumped on Mr. Smelley for no apparent reason."  Doc. 62 at 45.

The only CERT members present whom Smelley has been able to identify as allegedly involved in this incident are McWilliams and Edmonds.  *See* Doc. 13 at 6; Doc. 49 at 5, 9; Doc. 62 at 40.  Smelley alleges that McWilliams frisked Smelley, found no contraband, and then pushed Smelley to the floor.  Doc. 49 at 9; *see* Doc. 13 at 5; Doc. 62 at 40.  Smelley alleges that, once he was down, McWilliams and other CERT members hit Smelley on the back and in his torso area multiple times. Doc. 13 at 5, 8; Doc. 49 at 9; Doc. 62 at 47.

Smelley eventually has alleged that Edmonds was one of the CERT members who assaulted him.[3]  *See, e.g.*, Doc. 39-3 at 2.  Among other things, Smelley alleges that he "was attacked from behind by . . . Lt. Edmonds."  Doc. 62 at 3–4.  *But see, e.g.*, Doc. 13 at 6 (alleging that, "to [Smelley's] knowledge, Lt. Edmonds did not engage physically in this attack, but he was a witness to his co-workers attacking [Smelley]"); Doc. 13 at 8 ("Lt. Edmonds saw what happened").

---

[3] While Smelley consistently has asserted that he does not know which CERT members assaulted him, this apparent change in position with respect to Edmonds almost certainly raises a credibility issue for trial.

Smelley also represents that Edmonds' affidavit states that "'Edmonds took Smelley to the floor.'" Doc. 62 at 7. But that is what Defendants' special report says: "Edmonds took Smelley to the floor." Doc. 25 at 5. Instead, in his affidavit, Edmonds avers that "CERT [of which he is a member] moved towards inmate Smelley and took inmate Smelley to the floor." Doc. 25-2. Edmonds' affidavit does not otherwise aver whether he or any other individual CERT member "took inmate Smelley to the floor," *id.*—that is, whether he was involved in the alleged assault, observed it, or heard about it after the fact. *See* Doc. 25-2. Nor does Edmonds deny that he was one of the CERT members who took Smelley to the floor.

In his supplemental affidavit, Edmonds avers that "[he], along with several CERT members, responded to [the] hostage situation," that "CERT members took [Smelley] to the floor," and that—"[b]ecause of the chaotic and dangerous environment, the urgent need to restore safety to the facility, and [his] task of returning D-Unit inmates to their assigned cells"—he "was not able to ascertain with certainty the identities of the CERT members who took Mr. Smelley to the floor." Doc. 39-2 at 1–2.

In this regard, Head avers that he "did not recognize any of the CERT team members who entered except for Lieutenant Edmonds, who came in behind them." Doc. 37-1 at 1.

On September 5, 2023, Smelley filed a grievance stating that CERT members

assaulted him on August 13, 2023, and then denied him medical treatment.  Doc. 13-1 at 2.  That grievance was referred to Morgan for investigation on September 10, 2023 (Doc. 13-1 at 2), but Smelley never received any response.  Doc. 13 at 10, 14; Doc. 13-1 at 1; Doc. 49 at 11.

### 3.    Defendants' sworn averments and other evidence

According to Defendants' special reports, when CERT entered the C/D corridor, they gave "loud verbal commands for inmates to go inside their assigned unit."  Doc. 25-2.

All of the inmates complied, except Smelley who "remained standing in the corridor."  Doc. 25-2.

CERT members yelled for Smelley "to get down on the floor," but he did not comply.  Doc. 25-3.

CERT members "took inmate Smelley to the floor to bring him into compliance."  Doc. 25-2; Doc. 25-3.

By affidavit, McWilliams avers that he "do[es] not recall the situation or involvement in the situation that allegedly took place in Housing Unit[] C and Housing Unit D on August 13, 2023, at Donaldson Correctional Facility with inmate Lionel Smelley."  Doc. 57-1.

Head avers that, when CERT entered, "yelling to clear the corridor," the inmates "immediately went into the blocks except for inmate Smelley.  [Smelley]

raised his hands but did not move." Doc. 25-3. CERT members moved past Head, yelling at Smelley "to get down on the floor, and he did not comply." Doc. 25-3.

When CERT took Smelley to the floor, Head yelled twice at the CERT members to stop hitting Smelley because Smelley had been assisting Head. Doc. 25-3. Head did not know if the CERT members heard him; so, when Edmonds passed Head while going to D Block, Head told Edmonds that Smelley was trying to help. Doc. 25-3.

Edmonds avers that he entered C/D Blocks with the other CERT members, "giving loud verbal commands for all inmates to go inside their assigned unit." Doc. 25-2. Although other inmates dispersed from the corridor as instructed, "inmate Lionel Smelley . . . remained standing in the corridor refusing all orders given by CERT." Doc. 25-2. So CERT members "took inmate Smelley to the floor." Doc. 25-2; Doc. 39-2.

Smelley then was returned to C Block. Doc. 25-3 at 1.

Later that same day, Smelley asked Head to go to the infirmary; but, when Head called, he was told that the infirmary was only taking emergencies. Doc. 25-3 at 1. Head avers that, because "Smelley was ambulatory, clear eyed and not bleeding," Smelley was not considered an emergency. Doc. 25-3 at 1. Around 12:30 p.m., Head called the infirmary a second time, but "they were still busy." Doc. 25-3 at 1. Around 1:00 p.m., Head was reassigned to another task, but informed his

8

replacement to try to get Smelley to the infirmary.  Doc. 25-3 at 1.

Morgan avers by affidavit that, "months later," Smelley told her that he wanted her to investigate a CERT member "who[m] he could not name or identify and wanted [Morgan] to go back on the video footage.  [Morgan] explained to [Smelley] that [she] could not go back any further than thirty (30) days on video surveillance."  Doc. 25-1 at 1.

Leteetha Turner, an administrative support assistant for the Alabama Department of Corrections (ADOC), avers that she searched ADOC records for the alleged incident involving Smelley, but that the search produced no records—e.g., no duty officer report, incident report, body chart, or disciplinary charge.  Doc. 25-5.

### 4.    Record medical evidence

On August 22, 2023, Smelley completed a sick call request stating that he had been assaulted by CERT members, that he did not receive a body chart, and that he had pain in his chest, upper back, and side.  Doc. 25-4 at 11.  Smelley did not receive any medical care until August 30, 2023, when he was seen for "body aches."  Doc. 13 at 7; *see* Doc. 25-4 at 9.  The medical records show that Smelley complained of pain in his left rib cage, where a bruise was visible, and pain in his sternum.  Doc. 25-4 at 9; *see* Doc. 62 at 61.  He was prescribed ibuprofen.  Doc. 25-4 at 10.

On September 13, 2023, Smelley continued to complain of pain in his left rib

cage and shortness of breath.  Doc. 25-4 at 6.  On October 2, 2023, Smelley completed a sick call request stating that he continued to have chest, upper back, and side pain, since "August 13, 2023, in reference to [Smelley] being attacked by unknown CERT team members."  Doc. 25-4 at 8.  When Smelley was seen on October 13, 2023, he again was prescribed ibuprofen.  Doc. 25-4 at 8.

*

Based on the facts discussed above, Smelley's amended complaint—liberally construed—appears to allege claims for excessive force, failure to intervene, deliberate indifference to his medical needs, violation of his procedural due process rights, and supervisory liability.[4]  *See* Doc. 13 at 5, 6, 10; Doc. 49 at 6–7.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute

---

[4] Smelley alleges that his rights were violated under the Fifth, Sixth, Eighth, Thirteenth, Fourteenth, Fifteenth, and Nineteenth Amendments.  Doc. 13 at 3.  Only the Eighth Amendment and the Fourteenth Amendment are relevant here.  *See, e.g.*, *West v. Warden, Comm'r, ADOC*, 869 F.3d 1289, 1292 n.5 (11th Cir. 2017) (citing *Rhodes v. Chapman*, 452 U.S. 337, 344–45 (1981)); *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021).

10

about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, when ruling on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell*, 748 F.3d at 1098 (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit

11

does not preclude a finding that a genuine dispute of material fact exists." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019). And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial. *Id.* at 1209. When ruling on a summary judgment motion, a court cannot make credibility determinations. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

The court should grant Defendants' summary judgment motions on all claims against Defendants in their official capacities. On Smelley's excessive force claims, the court should deny Defendants' summary judgment motions against McWilliams and Edmonds, in their individual capacities only. And, on Smelley's claims for failure to intervene, deliberate indifference to medical needs, procedural due process violations, and supervisory liability, the court should grant Defendants' summary judgment motions.

## I.    The court should grant Defendants' summary judgment motions on Smelley's claims against Defendants in their official capacities.

The court should grant Defendants summary judgment on Smelley's claims against Defendants in their official capacities. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citation omitted); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit

12

against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.").

The Eleventh Amendment bars suits against States and their agencies and departments unless the state consents to suit.  *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (unless the State consents to suit the plaintiff cannot proceed against the State or any department thereof, and "[t]his bar exists whether the relief sought is legal or equitable").  Under Alabama law, "the State of Alabama shall never be made a defendant in any court of law or equity." *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (quoting Alabama Const. Art I, § 14); *see also Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994) ("[S]tate officials sued for damages in their official capacities are immune from suit in federal court.").[5]

---

[5]  Smelley has not shown that he is entitled to prospective injunctive relief because he has not alleged any threat of future injury.  "When a plaintiff seeks prospective relief to prevent an injury, [he] must establish that the threatened injury is certainly impending." *Independent Party of Florida v. Secretary, State of Florida*, 967 F.3d 1277, 1280 (11th Cir. 2020) (quotation marks omitted).  "[A] party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to merely conjectural or hypothetical—threat of *future* injury." *Wooden v. Board of Regents of University System of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001) (emphasis in original).  Nor, as a general matter, can the court order prison officials to "obey the law" in the future. *See, e.g.*, *SEC v. Smyth*, 420 F.3d 1225, 123 n.14 (11th Cir. 2005) ("This Circuit has held that 'obey the law' injunctions are unenforceable.").

**II.    The court should grant Defendants' summary judgment motions on Smelley's excessive force claims as to all Defendants except McWilliams and Edmonds, in their individual capacities only.**

Under the Eighth Amendment,[6] "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (quotation marks omitted). "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 320).

In the context of a custodial excessive force claim, "corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Hudson*, 503 U.S. at 6 (citations omitted). And, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Id.*

For instance, the use of force generally is justified where it is "necessary to restore order." *See, e.g.*, *Williams v. Radford*, 64 F.4th 1185, 1197 (11th Cir. 2023)

---

[6] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (stating that, with a few exceptions, the United States Supreme Court "has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States").

(citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)); *accord Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." (citations omitted)).

Regardless, on a custodial excessive force claim, "whenever prison officials stand accused of using excessive physical force," the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7; *see also Sears*, 922 F.3d at 1205 (similar).

The United States Supreme Court has articulated factors for "determining whether the use of force" in the custodial context "was wanton and unnecessary." *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319 ("the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment"). Those factors (commonly referred to as the *Whitley* factors) include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Also, "the extent of injury suffered by an inmate is one factor that may suggest

15

'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

In addition, the Supreme Court has instructed that "courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the *alleged wrongdoing* was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (citation and quotation marks omitted; alteration in original; emphasis added). In this regard, the Supreme Court has referred to a "subjective" and "objective" component of a custodial excessive force claim. *Id.* ("the subjective aspect of an Eighth Amendment claim . . . can be distinguished from the objective facet of the same claim").

For the subjective component, analyzed under the *Whitley* factors, a court should be mindful of the prison officials' point of view based on the facts known at the time, and should "give a wide range of deference to prison officials acting to preserve discipline and security." *Sears*, 922 F.3d at 1205 (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). A court should recognize that "corrections

16

officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance" (*Hudson*, 503 U.S. at 6 (citations omitted)), but that deference "does not insulate from review actions taken in bad faith or for no legitimate purpose" (*Whitley*, 475 U.S. at 322).

For the objective component, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9 (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (citations and quotation marks omitted); *see Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citations and quotation marks omitted)).

But, regardless "whether or not significant injury is evident," "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id*.

As the Supreme Court has explained, "[i]njury and force . . . are only

17

imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

Moreover, qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To overcome qualified immunity, a plaintiff then must show (1) that the official violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

18

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant official).

In this case, Smelley alleges that CERT members—McWilliams and Edmonds—assaulted him. Smelley does not dispute that McWilliams and Edmonds were engaged in a discretionary function. Consequently, Smelley must show that McWilliams and Edmonds violated his right to be free from excessive force, and that the right was clearly established on the facts of this case.

At the summary judgment stage, the court must construe all of the evidence and draw all reasonable inferences in Smelley's favor. *Centurion Air Cargo, Inc.*, 420 F.3d at 1149. Because CERT was responding to a prison crisis, where an inmate had a handgun and was taking hostages (Doc. 25-1), some use of force would have

19

been reasonable to restore order throughout the facility. But, viewing the record in the light most favorable to Smelley, CERT entered C/D Blocks "hours after" the inmate with the handgun "had . . . been taken safely into custody." Doc. 62 at 38. Also, Smelley did not return to his cell as instructed by CERT members because he was "trying to help" Head. Doc. 25-3. Further, Smelley complied with McWilliams' order to place his hands on the wall. Doc. 13 at 5; Doc. 49 at 9; Doc. 62 at 40, 47. After Smelley placed his hands on the wall, he was frisked, and no contraband was found. Doc. 13 at 5; Doc. 62 at 47. Then, a CERT "member pushed [Smelley] to the floor," and CERT members, including McWilliams and Edmonds (*see supra* Factual background), "started hitting [him] on the back, and torso area repeatedly." Doc. 13 at 5; Doc. 62 at 47.

Head avers that he yelled to the CERT members to "stop hitting Smelley." Doc. 25-3. Edmonds does not deny that he and/or other CERT members hit Smelley. Doc. 25-2. And McWilliams does not deny that he and/or other CERT members hit Smelley; instead he avers that he has no memory of the alleged incident. Doc. 57-1. Thus, viewing the record in the light most favorable to Smelley, Smelley complied with the order to place his hands on the wall (hours after the inmate with the handgun had been taken into custody), CERT members knew before taking Smelley down that he was unarmed and posed no danger, McWilliams and Edmonds nevertheless hit Smelley repeatedly, and Smelley sustained physical injuries.

20

Because a reasonable jury could find that McWilliams and Edmonds applied the alleged force "maliciously and sadistically to cause harm," and not "in a good-faith effort to maintain or restore discipline" (*Hudson*, 503 U.S. at 6–7), McWilliams and Edmonds are not entitled to qualified immunity at this time.  On the current record, McWilliams and Edmonds had "fair warning" that such alleged conduct is unconstitutional.  *See Piazza*, 923 F.3d at 955; *see also Pullen v. Osceola Cty.*, 861 F. App'x 284, 290 (11th Cir. 2021) (holding that the use of force "maliciously and sadistically to cause harm" is a clearly established violation of the Eighth Amendment, and that "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation" (quoting *Skrtich v. Thorton*, 280 F.3d 1295, 1302 (11th Cir. 2002))).[7]

### III. The court should grant Defendants' summary judgment motions on Smelley's failure to intervene claims.

The court should grant Defendants summary judgment on Smelley's failure to intervene claims.  Prison officials can be held liable under § 1983 if they fail or

---

[7] In *Skrtich*, the Eleventh Circuit held that "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment." *Skrtich*, 280 F.3d at 1301.  But multiple district courts in this circuit—including in this district—have noted "significant tension between *Skrtich*'s bright-line rule and Supreme Court precedent on qualified immunity, which may call for a more fact-specific analysis of whether the particular type and extent of force at issue has been 'clearly established' as unconstitutional." *Wilhite v. Parker*, No. 7:20-CV-00847-KOB, 2022 WL 3718502, at *3 (N.D. Ala. Aug. 29, 2022); *see also Stalley v. Cumbie*, 586 F. Supp. 3d 1211, 1227 n.8 (M.D. Fla. 2022).

refuse to intervene when a constitutional violation occurs in their presence. *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998). If an officer "fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). To establish a failure to intervene claim, a plaintiff must show that the defendant was "in a position to intervene," yet "failed to do so." *Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023); *see also Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)). A claim for failure to intervene also requires a showing of a defendant's deliberate indifference to a substantial risk of serious harm. *See Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (discussing the application of the deliberate indifference standard to a failure to intervene claim).

Smelley appears to allege that both Edmonds and Head failed to intervene during the alleged assault by CERT members, although Smelley also eventually has alleged that Edmonds was one of the CERT members who assaulted him (*see supra* Factual background). Doc. 13 at 6. In any event, Head avers that he yelled at the CERT members to stop hitting Smelley, but that Head does not know if those members heard him. Doc. 25-3. According to Head, when Edmonds passed him on his way to D Block, Head told Edmonds that Smelley was trying to help. Doc. 25-3. According to Edmonds, "[he] and CERT members entered C/D corridor," and

22

"CERT moved towards inmate Smelley and took inmate Smelley to the floor." Doc. 25-2.

Even viewing the record in the light most favorable to Smelley, there are no facts about any timeframe as to the length of the alleged assault or facts that show Edmonds and/or Head physically was close enough to the alleged assault to be able to intervene (to the extent that Edmonds did not participate in the alleged assault). Without any such facts, there is no basis for a reasonable jury to find that either Edmonds or Head was in a position to intervene. *See Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (affirming summary judgment for the defendant correctional officer, where the plaintiff "presented no evidence that [the defendant officer] had the ability to reasonably insert himself between [the plaintiff] and [his attacker] to stop the assault without additional help," and had not presented "evidence . . . as to how long this assault went on before intervention occurred"); *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (affirming the dismissal of a failure to intervene claim in relevant part because the plaintiff did not "allege facts indicating that the duration of the fight or the position of the guards were such that the guards would have been in a 'position to intervene'"); *Johnson v. Lang*, 2022 WL 2734421, at *5 (11th Cir. July 14, 2022) (summary judgment was appropriate where the plaintiff's sworn complaint "contained no information about how long the attack lasted or how much of it [the defendant] witnessed").

23

**IV.    The court should grant Defendants' summary judgment motions on Smelley's claims for deliberate indifference to his medical needs.**

The court should grant Defendants summary judgment on Smelley's claims for deliberate indifference to his medical needs.    The Constitution "prohibits deliberate indifference to serious medical needs of prisoners." *Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020).    But "[a] prisoner bringing a deliberate-indifference [to medical needs] claim has a steep hill to climb." *Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020).    Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

To prove a claim for deliberate indifference to medical needs, a plaintiff must show (1) an objectively serious medical need, (2) a defendant's deliberate indifference to that need, and (3) causation between that indifference and the plaintiff's injury.    *Gilmore v. Hodges*, 738 F.3d 266, 273–74 (11th Cir. 2013).    An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Keohane*, 952 F.3d at 1266.

A defendant's deliberate indifference to that need is a subjective inquiry. *See, e.g.*, *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022).    To meet the subjective component, a plaintiff must demonstrate that the official acted with "deliberate indifference" to his objectively serious medical need. *Richardson v.*

24

*Johnson*, 598 F.3d 734, 737 (11th Cir. 2010).    This subjective, deliberate indifference component has three requirements:  (1) subjective knowledge of a risk of serious harm, (2) disregard of that risk, (3) by conduct that is more than gross negligence.  *Hoffer*, 973 F.3d at 1270.

In this regard, a plaintiff must show that the defendant acted with "subjective recklessness as used in the criminal law," meaning that "the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm," and failed to respond reasonably to that risk.  *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024).

The third and final element, causation, requires that a plaintiff produce evidence that the defendants' acts or omissions caused his injuries.  *See Wade*, 106 F.4th at 1253.

Here, even assuming that Smelley's evidence of bruising and pain could show an objectively serious medical need, Smelley does not allege that any Defendant prevented or delayed his medical care—much less that any Defendant did so with subjective, deliberate indifference.  The record shows instead that Head called the infirmary twice after the assault, and that both times Head was told that the infirmary only was treating emergencies.  Doc. 25-3.  Smelley does not show that his injuries rose to the infirmary's level of an "emergency," nor does he allege that Head, Morgan, Edmonds, or McWilliams knew he needed medical care and with that

25

knowledge refused to allow him to receive such care. Thus, there is no allegation or evidence that any Defendant acted with "subjective recklessness as used in the criminal law," such that the Defendant "was actually, subjectively aware that his own conduct caused a substantial risk of serious harm." *Wade*, 106 F.4th at 1262.

**V.    The court should grant Defendants' summary judgment motions on Smelley's claims for violations of his procedural due process rights.**

The court should grant Defendants summary judgment on Smelley's claims for violations of his procedural due process rights. Liberally construed, Smelley appears to allege that his procedural due process rights were violated because he did not receive a body chart or have a disciplinary hearing. Doc. 49 at 6–7. Smelley alleges that "if an inmate is restrained or beaten by an officer or officers it is policy that the inmate is taken to the infirmary for a body chart." Doc. 13 at 6. Smelley also alleges that, if an inmate violates prison rules, ADOC regulations require that the inmate be given a disciplinary hearing. Doc. 49 at 6–7. But an alleged violation of administrative regulations, standing alone, does not support a constitutional claim. *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (reasoning that prison regulations are "primarily designed to guide correctional officers in the administration of a prison," and that "such regulations are not designated to confer [constitutional] rights on inmates"); *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000) (a governmental agency's failure to follow procedures, standing alone, does not raise a constitutional issue).

26

Prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Consequently, a prison official's failure to follow internal rules or regulations does not provide a basis for relief under § 1983. *See, e.g.*, *Woodson v. Whitehead*, 673 F. App'x 931, 933 (11th Cir. 2016); *Mathews v. Moss*, 506 F. App'x 981, 984 n.3 (11th Cir. 2013) ("[M]andatory language in . . . prison regulations is insufficient to create a protected liberty interest" (citing *Sandin*, 515 U.S. at 483–84)).

Likewise, a prison official's failure to investigate an inmate's grievance does not state a constitutional violation. *Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011) (inmates have no constitutionally protected liberty interest in access to prison grievance procedures); *Moore v. McLaughlin*, 569 F. App'x 656, 659 (11th Cir. 2014) (recognizing that, because there is no constitutional right to grievance procedures, prisoners have no right to have a grievance investigated).

## VI. The court should grant Morgan's summary judgment motion on Smelley's claim for supervisory liability.

The court should grant Morgan summary judgment on Smelley's claim for supervisory liability. Under § 1983, a defendant's position as a supervisor does not automatically subject him or her to liability for the conduct of subordinates through respondeat superior or vicarious liability. *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034,

27

1047 (11th Cir. 2014). Instead, a supervisor can be liable only if the supervisor directly participated in the unconstitutional conduct, or if there is a causal connection between the supervisor's conduct and the alleged constitutional violation. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)); *see Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019).

A plaintiff can establish such a causal connection in the following circumstances: a history of widespread abuse puts a responsible supervisor on notice of the need to correct an alleged violation, and he fails to do so; a supervisor's improper custom or policy results in deliberate indifference to constitutional rights; or, facts suggest that a supervisor ordered his subordinates to act unlawfully, or knew they would act unlawfully and failed to stop them. *Gonzalez v. Reno*, 325 F.3d 1228, 1234–35 (11th Cir. 2003). Proof of a single incident of unconstitutional conduct is not sufficient to demonstrate a custom or policy for purposes of § 1983 liability. *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011). Rather, a plaintiff must establish a pattern of similar violations. *Id.*

Smelley names Morgan, as a Warden of Donaldson, as a Defendant, alleging that she was in charge of security at Donaldson. Doc. 62 at 18. But Smelley does not allege that Morgan directly participated in any violation of his rights, or knew officers at Donaldson would violate Smelley's rights and failed to take any action to

28

prevent that from occurring. *See Harrison*, 746 F.3d at 1298. And Smelley does not allege or identify any facts about a pattern or history of widespread abuse that put Morgan on notice. *See Gonzalez*, 325 F.3d at 1234–35. Instead, Smelley alleges only the single incident, which is insufficient to show supervisory liability under § 1983. *See Craig*, 643 F.3d at 1310; *accord Henley*, 945 F.3d at 1331 (reasoning that a showing of a custom or policy requires "multiple incidents or multiple reports of prior misconduct by a particular employee").

Furthermore, Defendants liberally construe Smelley's allegations that Morgan "covered up" this incident as a claim for conspiracy to violate his civil rights. *See* Doc. 25 at 19–20. To prove a claim for conspiracy under § 1983, a plaintiff must show the following: "(1) the defendants reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights; and (2) the conspiracy resulted in an actual denial of one of his constitutional rights." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1327 (11th Cir. 2015); *see Land v. Sheriff of Jackson Cty., Fla.*, 85 F.4th 1121, 1129–30 (11th Cir. 2023). But Smelley has not alleged facts or identified any evidence based on which a reasonable jury could find or infer any understanding or agreement between Morgan and any other Defendant or find that Morgan's alleged failure to investigate violated a constitutional right. *See Weiland*, 792 F.3d at 1327.

29

## RECOMMENDATION

For the reasons stated above, this report **RECOMMENDS** that the court **DENY** Defendants' summary judgment motions on Smelley's excessive force claims against Defendants Edmonds and McWilliams in their individual capacities only, and that the court **REFER** those claims back to the undersigned for further proceedings consistent with this report and recommendation.

In addition, this report **RECOMMENDS** that the court **GRANT** Defendants' summary judgment motions on all of Smelley's other claims.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal

30

conclusions for plain error if necessary in the interests of justice.  11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a de novo review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations.  The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment entered by a District Judge.

**DONE** this May 20, 2025.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE